BARRY J. PORTMAN
Federal Public Defender
ELIZABETH M. FALK
Assistant Federal Public Defender
19th Floor Federal Building
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700

Counsel for Defendant LAU

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COLEMAN LAU,<br><br>Defendant. | No. CR-07-0482 VRW<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>Hearing Date: February 21, 2008<br>Time: 2:00 p.m.<br>Court: The Honorable Chief Judge Vaughn R. Walker |

INTRODUCTION

Mr. Coleman Lau now appears before the Court, having been convicted of one count of smuggling turtles, in violation of 18 U.S.C. § 545, and one count of making a false statement, in violation of 18 U.S.C. § 1001. The charges at issue in this case arose out of a March 2, 2004 border search of Mr. Lau by U.S. Customs. Mr. Lau was returning by airplane from Hong Kong and was in possession of 14 juvenile Fly River turtles, which he did not declare. At the time of the search, Mr. Lau was twenty-six years old.

Over three years later, on July 24, 2007, the United States Attorney's Office indicted Mr. Lau for the aforementioned conduct. It is unknown why the United States waited over three years to prosecute Mr. Lau for this offense. Between March, 2004 and February, 2008, Mr. Lau has remained gainfully employed, has respected all laws and policies of the United States (and

CR-07-482 VRW; DEFENDANT'S
SENTENCING MEMORANDUM                    1

1  U.S. Customs and Border Protection in particular) and has not gotten himself in any further
2  trouble with the law.  After the Court weighs all the circumstances of this case, including the fact
3  that the applicable Guideline range is in Zone B of the Guidelines, Mr. Lau asks the Court to
4  impose a straight probation sentence pursuant to the sentencing factors stated in U.S.S.G. §
5  3553(a).

**PRESENTENCE REPORT**

As a starting place, the United States erroneously accuses Mr. Lau of making numerous objections to the Presentence Report and the Probation Officer's Guideline calculation that he did not make.  The recitation of the United States is thus inaccurate, and must be corrected.

### I.   MR. LAU DOES NOT OBJECT TO THE COMMERCIAL GAIN ENHANCEMENT

Starting on page 4 of the Government's Sentencing Memorandum, the government writes "Mr. Lau challenges that the fourteen turtles were smuggled into the United States for commercial gain."  *See* Gov. Mem. at 4:4.  This is simply untrue.  Mr. Lau did not make any objection to this Guideline enhancement (listed in Paragraph 20 of the Presentence Report), and never denied such a fact to the Probation Officer assigned to the case.  *See* Defendant's Objections, PSR Addendum.  Although Mr. Lau did initially tell the Fish and Wildlife officials who interviewed him on March 8, 2004 that the turtles were "for personal use only" and that "he wanted them for pets," he asks the Court to understand that he was interviewed at his place of employment on the spot, and gave these statement without thinking the matter through clearly, while he was in a scared state regarding the interview.  At the time Mr. Lau made this statement to Fish and Wildlife agents back in March, 2004, his intention was to personally house and raise the turtles from juvenile status to adult status.  However, Mr. Lau did not intend to keep the turtles forever, and he accepts responsibility now for the fact that he did not tell the Fish and Wildlife agents that he intended to part with the turtles after they reached adulthood.  Mr. Lau does herein acknowledge that after the turtles had reached an older age, he planned to either give

CR-07-482 VRW; DEFENDANT'S
SENTENCING MEMORANDUM                         2

them away to family members as gifts, or sell them. He therefore acknowledges that his initial statement to Fish and Wildlife was incomplete and misleading, and he apologizes to the agency and to the Court for not telling the agents the full extent of his plans in connection with the turtles. Given his intentions for the turtles once they reached adult status, Mr. Lau did not challenge the commercial game enhancement through the PSR process, and does not challenge the enhancement at sentencing.

## II. MR. LAU DOES NOT CHALLENGE THE QUARANTINE ENHANCEMENT

Mr. Lau never challenged, nor objected to, the two level enhancement applied due to the fact that the turtles were not quarantined, listed in Paragraph 21 of the Presentence Report. It is unclear why the government believes that he did. *See* Gov. Mem. at 4:20. The record should reflect that Mr. Lau has no objection to this enhancement.

## III. THE TWO LEVEL ENHANCEMENT FOR MARKET VALUE OF THE TURTLES SHOULD ONLY BE ONE LEVEL

The one objection to the Presentence Report that Mr. Lau does make is a challenge to the two-level increase in his Guideline range in Paragraph 22 of the Presentence Report. Mr. Lau challenged this enhancement due to the government's claim that the juvenile Fly River turtles were worth $500.00 per turtle at the time he imported them. Mr. Lau does not dispute that the fair market value of the fourteen turtles in the United States in 2004 was at least $2,000. As such, under U.S.S.G. §2Q2.1(b)(3)(A)(i), Mr. Lau argues that his Guidelines should reflect a one level, rather than a two level increase for this enhancement.

The basis for the government's assessment of the turtles' value at $500.00 each is a declaration prepared by Special Agent Ken McCloud of United States Fish & Wildlife Services. *See* Gov. Mem, Exhibit A. To place a value on the turtles, Agent McCloud conducted a study of "over 400 price lists." *Id.* at 2:b. Of those 400 lists, Agent McCloud found only 9 relevant entries that listed a value of Fly River turtles. *Id.* Of these nine entries, two are from 2008, 4 are from 2005, one is from 2004, one is from 2001, and one is from 1999. *Id.* From these entries,

Agent McCloud estimates the value of the turtles at issue in this case at $500.00, although it is unclear how the various entries he relied on resulted in that figure.

In response, Mr. Lau now presents the Court with several listings on internet web sites specializing in reptile sales, which both Mr. Lau and FPD Investigator Melissa Frink recently researched and located. In these internet listings, Fly River turtles are listed for sale as (in order) $175 on March 21, 2004 (by "captin howdey"); $350.00 on October 14, 2007 (by "aimhigher38"); $250.00 on October 3, 2004 (by "captin howdey"); $200.00 on August 22, 2004 (by "dragonball1012") and for 200 British pounds (by "dave" on December 3, 2005). In addition, there are numerous internet chat on web posting pages indicating that Fly River turtles sell for $150.00-$250.00 (by "dirtyevo" on April 7, 2005); 75 British pounds (by "dixon" on July 26, 2004); and $250.00 (by "M" on July 27, 2006).

In sum, it appears that Fly River turtles sell for numerous prices around the world, and that their "fair market value" is wide-ranging. Even the Hoover memorandum, attached and cited in the McCloud declaration as a valuable authority on valuing reptiles, states that "reptile dealers provided a range between $200.00 and $1000.00" for Fly River turtles. *See* Gov. Mem, Exhibit A, at 11. Given this variation, it is nearly impossible for this Court to gauge the accurate fair market value for the turtles. The valuation problem is compounded by the fact that in 2004, it was legal to trade or sell Fly River turtles in the United States, as they were not a protected species in the United States. *See* McCloud Declaration, Gov. Mem. Exhibit A, at 1:2 (stating that the Fly River turtles only gained international protection in 2005 through CITES.) Many of the price listings relied upon by Agent McCloud to set the turtles' values were set *after* it became illegal to trade Fly River turtles freely in this country. *Id.* at 2:b (listing many values from 2005 and 2008). As such, it is unclear to what extent Agent McCloud's final figure of $500.00 reflects the trading status of Fly River turtles as legal, rather than illegal.

It is the government's burden to prove sentencing enhancements by a preponderance of the evidence. Here, the data surrounding the turtles' value is inconclusive. "When information

CR-07-482 VRW; DEFENDANT'S
SENTENCING MEMORANDUM                     4

is reasonably available, "market value" under subsection (b)(3)(A) shall be based on the fair-market retail price. Where the fair-market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information . . ." U.S.S.G. §2Q2.1, Commentary, Application n. 4. Both Mr. Lau and Agent McCloud rely on internet pricing, in part, to make an argument regarding the turtles' value. Given the reliable evidence provided that conflicts with Agent McCloud's assessment of the turtles' value at $500.00 apiece, the government has not met its burden to prove a collective value exceeding $5000.00. Valued at $350.00 each, the turtles' collective value would be $4900.00; valued at $300.00 each, the collective value is only $4200.00. The difference between $350.00 and $500.00 is not large, and given the one level Guideline differential between the two, Mr. Lau should be given the benefit of the doubt as to the turtles' fair market value. Moreover, as Mr. Lau's hypothetical market for the turtles would have most likely been the internet market, it is reasonable to conclude that the numerous internet listings for the turtles provided by Mr. Lau are a reasonable assessment of the money he would have received for the turtles. As such, Mr. Lau asks the Court to set the collective value of the turtles between $2000 and $5000.

Should the Court concur with Mr. Lau's analysis, the applicable Offense Level would be 9, rather than 10. At Criminal History Category I, the applicable advisory sentencing guideline range would be 4-10 months in Zone B, rather than 6-12 months in Zone B.

### ARGUMENT FOR PROBATIONARY SENTENCE

I.  **UNDER *BOOKER*, *GALL* AND *KIMBROUGH*, THE APPLICABLE GUIDELINE RANGE IS ONLY THE STARTING PLACE FOR THE COURT**

After *United States v. Booker*, 125 S.Ct 738 (2005). the applicable Sentencing Guideline range of either 6-12 months in Zone B (the government's calculations) or 4-10 months in Zone B (Mr. Lau's calculations) is not binding upon this Court. "A district court must consider the guideline range, but must also consider the other directives set forth in 18 U.S.C. § 3553(a).

Thus, under *Booker*, courts must treat the Guidelines as just one of a number of sentencing factors." *United States v. Ranum*, 353 F.Supp. 2d 984, 985 (E.D. Wisc. 2005). Under *Booker*, the United States Sentencing Guidelines are merely "advisory," and sentencing courts are required to consider all of the factors listed in 18 U.S.C. § 3553(a) in imposing sentence. *Booker*, 125 S.Ct. 738, 757 (2005). Significantly, "there is no presumption of *unreasonableness* that attaches to a sentence that varies from the range. A sentence outside the range need only be adequately explained and consistent with § 3553(a) factors." *United States v. Jordan*, 435 F.3d 693, 698 (7th Cir. 2006) (emphasis in original).

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. See 18 U.S.C. § 3553(a) (emphasis added). Those purposes include the need:

- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;
- to create adequate deterrence;
- to protect the public from future crimes of the defendant; and
- to provide the defendant with necessary treatment and training.

18 U.S.C. § 3553(a)(2).

Section 3553(a) directs sentencing courts to consider a number of additional factors as well, including:

- the nature and circumstances of the offense, § 3553(a)(1);
- the history and characteristics of the defendant, § 3553(a)(1);
- the kinds of sentences available, § 3553(a)(3);
- the sentencing guideline range, § 3553(a)(4);
- pertinent Sentencing Commission policy statements, § 3553(a)(5);
- the need to avoid unwarranted sentencing disparities, § 3553(a)(6);
- the need to provide restitution to any victims of the offense, § 3553(a)(7).

To the extent that the sentencing factors that the Court is bound to consider pursuant to 18 U.S.C. § 3553(a) conflict with the Guidelines or the policy statements of the Guidelines, the district court must, after *Booker*, consider the 3553(a) factors equally with the Guidelines. *See United States v. Myers*, 353 F.Supp.2d 1026, 1029 (S.D. Iowa 2005)(stating that "the work of a sentencing court, then, is to evaluate all the interest, as represented by the statutory factors,

through careful and patient attention to all parties involved.")

These principles were solidified this past year. On December 10, 2007, the United States Supreme Court decided *United States v. Gall*, 2007 U.S. LEXIS 13083. In *Gall*, an ecstasy distribution case in which the defendant was in college at the time of the offense, the district court departed from the applicable Guideline range of 30-37 months and sentenced the defendant to 36 months of probation. The Eighth Circuit reversed the district court's sentence. In its opinion affirming the district court and reversing the Eighth Circuit, the Supreme Court set forth the proper analysis that district courts should follow in evaluating a proper sentence in the wake of *United States v. Booker*, 543 U.S. 220 (2005):

> A district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, he may not presume that the Guideline range is reasonable. He must make an individualized assessment based on all the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

*Gall*, 2007 U.S. LEXIS 13083 at 20-21 (citations omitted). "It has been uniform and consistent in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 26. Each sentence, regardless of where the sentence falls in comparison to the applicable Guideline range, is reviewed by the Court of Appeals under an abuse of discretion standard. *Id.* After *Gall*, it is clear that federal district courts now enjoy tremendous discretion on a case-by-case basis at sentencing.

Once the Court determines and considers the advisory Guideline range, this Court must then equally evaluate the factors enunciated under Title 18, Section 3553(a) to determine a just

and appropriate sentence. "District courts must treat the Guidelines as the "starting point and initial benchmark." *Kimbrough v. United States*, __U.S.__, 128 S. Ct. 558 at *43 (2007)(citing *Gall v. United States*, ___ U.S.___, 128 S.Ct. 556 at *21 (2007)). "While the statute still requires a court to give respectful consideration to the Guidelines, *Booker* permits the court to tailor the sentence in light of other statutory concerns as well." *Id.* at *32 (citations omitted).

### II. A SENTENCE OF STRAIGHT PROBATION FOR MR. LAU IS THE SENTENCE "NO GREATER THAN NECESSARY" TO SERVE THE GOALS OF SENTENCING

When all the factors of this case are considered under 18 U.S.C. § 3553(a), a probation sentence for Mr. Lau is the sentence "sufficient, but no greater than necessary" to fulfil the goals of sentencing enunciated by Congress.

First, this offense occurred in March, 2004. It is now February, 2008. Since March of 2004, Mr. Lau has traveled outside the country on several occasions, and has not incurred a single additional customs or border violation since March of 2004. Quite simply, Mr. Lau learned his lesson, and he has not attempted to bring wildlife into the United States since his stop and questioning by border patrol agents in 2004. He lives a quiet life by living with his parents and younger brother, and works ten hour days at the Sixth Avenue Aquarium. Mr. Lau had not had any trouble with the law since March of 2004, and thus has not repeated his poor choice to disobey the law. He is not an individual for whom a custodial sentence is now required in 2008 to serve the purposes of deterrence, rehabilitation, or protection of the public.

Moreover, this court should consider the circumstances of the instant offense as they intersect with Mr. Lau himself. By late 2007, Mr. Lau believed that he had simply been provided with a warning by U.S. Customs and Fish and Wildlife, and had heeded that warning throughout his employment and his international travels. With respect for the rule of law in mind, Mr. Lau moved on, continued to work hard, and put the customs stop at the back of his mind, knowing that he would follow the rules from thereon out. Suddenly, over three years later, Mr. Lau is cuffed and arrested at his place of employment and charged with two felonies. Two felony

convictions are a serious setback for an individual under 30 years of age. These convictions will thwart Mr. Lau's efforts at gaining numerous employment opportunities, and will no doubt impede him ability to advance professionally. Moreover, as recognized by the district court in *Gall*, and cited affirmatively by the Supreme Court, probation itself is a significant sanction for an individual in Mr. Lau's position. As stated by the *Gall* court, a probationary sentence is "not granted out of a spirit of leniency" and "is not merely letting an offender off":

> Custodial sentences are qualitatively more severe that probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially reduce their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the Court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associated with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the Court.

*Gall, supra*, at 18 (citations omitted). In many cases, probation is viewed as an adequate punishment, both to promote respect for the law, reflect the seriousness of the offense, and afford adequate deterrence.

The government argues that two months of imprisonment are necessary to adequately punish Mr. Lau. The problem with the government's argument is that it fails to point to any individual factor of Mr. Lau's that mandates incarceration as an adequate punishment. Instead, the government points to two factors that, in its view, mandates a sentence of incarceration in this case – neither of which are related to Mr. Lau. First, the government argues that trafficking in wildlife is a serious and significant offense. Mr. Lau has immense respect for the government's argument in this regard – he now has two felony convictions on his record to account for his wrongdoing. The defense concurs with the government that illegal wildlife trading should be curtailed, and offenders should be punished. The defense also concurs that the offense is a serious offense. But on the same hand, all federal cases are serious – if they weren't, they would not be indicted by the U.S. Attorney's Office, particularly as felony prosecutions. Numerous defendants convicted of serious fraud, theft, and felony drug cases receive sentences of straight

probation.  The government's argument fails to explain why Mr. Lau – a then 26 year old young man who made a one time foolish mistake of buying turtles in Hong Kong for $10.00 and hiding them in his jacket – requires a custodial sentence for the severity of his crime to be impressed upon him.

The government's second argument asks the Court to impose a custodial sentence for Mr. Lau to "ensure uniformity of sentences for wildlife trafficking."  Gov. Mem. at 7:10.  The government then cites numerous cases as examples, absent explanation of the particular factors involved in those cases.  Nor does the government cite one factor at issue in the custodial cases it lists that is common with Mr. Lau's case, or explain whether *any* of the cited cases share *any* characteristics of the instant case.  The government's argument is essentially comparing apples to oranges, and ignores the mandate of 18 U.S.C. § 3553(a) that the Court evaluate the circumstances of *this particular* offense, as well as the history and characteristics of *this particular* defendant.  The fact that custody was imposed in 10-12 wildlife cases across the United States does not mean that custody is an appropriate sentence in Mr. Lau's case.

Many of the cited defendants were not published cases; as such, defense counsel is in a difficult position to go through each case and explain why Mr. Lau's case is substantially different.  Regardless, it is quite evident from the sentences cited by the government that most, if not all of the defendants named committed far serious offenses against wildlife than Mr. Lau.  For example, in *United States v. Paluch*, 84 Fed. Appx. 740 (9th Cir. 2003), the defendant was sentenced to 24 months in custody after being convicted of felony conspiracy **at trial**.  It is evident that defendant Paluch did not accept responsibility as Mr. Lau has done here.  Moreover, according to the facts stated by the Ninth Circuit, defendant Paluch was apparently involved in an ongoing conspiracy to smuggle wildlife into the United States; although the case does not state the volume of wildlife at issue, it does mention that Paluch was involved in at least six international shipments of illegal wildlife.  *Id*. at *9.  Defendant Paluch was also the "mastermind" of the conspiracy at issue, which involved bribing Federal Express employees to

1  smuggle over $90,000 of wildlife illegally into the United States.  When this Court examines the
2  details of the two cases, it becomes apparent that the government's comparison of the two cases
3  is ill-conceived; defendant Paluch caused far more damage to protected species that Mr. Lau has
4  done.  Given the high sentences cited in the government's memorandum, it is likely that most of
5  the government's "comparison" cases involve mass scale conspiracy schemes to import huge
6  volumes of illegal wildlife (such as in the *Paluch* case) rather than facts  akin to the instant case.

7  In setting forth this argument, Mr. Lau does not seek to minimize his own role in harming
8  wildlife, for which he is deeply sorry.  Mr. Lau fully accepts responsibility for his conduct, and
9  he asks this Court to accept his apology for his unlawful importation of the turtles.  His decision
10 to purchase fourteen turtles in Hong Kong for $10.00 each and bring them to the United States in
11 his jacket was unlawful, and he does not seek to minimize the impact of his conduct by asking
12 for a probationary sentence.  He simply wishes to assure the Court that he has learned his lesson
13 in connection with protected wildlife species, and he will never again violate or attempt to violate
14 any Customs or Border protection law, and Fish and Wildlife regulation, or any other state or
15 federal statute involving the protection of wildlife species.

Dated: February 18, 2008

Respectfully submitted,

BARRY J. PORTMAN
Federal Public Defender

/S/

ELIZABETH M. FALK
Assistant Federal Public Defender